No. 9,443.

GOMILA & CO., VS. JOHN T. MILLIKEN—KELHOR BROS., GARNISHEES.

1. An objection to the effect of a citation and to its sufficiency to bring an absentee into court, as a garnishee in an attachment suit, is substantially an exception to the jurisdiction of the court *ratione personæ*; and, to be availing, it must be formally presented *in limine*, and by way of exception, and must be passed upon by the court, or the objection will be considered to have been waived

2. It has been the uniform and consistent ruling of our predecessors, and of this Court, since the decision of Phipps vs. Snodgrass, 31 Ann. 88, that an exception to the jurisdiction of the court *ratione personæ* must be taken *in limine*.

Gomila & Co., vs. Milliken.

3. Under the jurisprudence of this Court interpreting our Code of Practice, the *hour of the day* at which an attachment is levied, is taken, as determining the priority in court of the privilege conferred thereby, in respect to others levied upon the same day.

4. A party having entered into *four distinct and separate contracts* for the delivery of a specified quantity of corn to another, at different dates, completes and fulfills the two first maturing, and defaults on the other two, subsequently: *Held* that the contractor is entitled to payment of the price at the *instant of complete fulfillment of two* and the amount due him could be legally garnisheed by his creditors; and, that the contractor could not hold same for his reimbursement for the loss of profits on the two remaining contracts, which is occasioned by the contractor's default subsequently.

APPEAL from the Civil District Court for the Parish of Orleans. Rightor, J.

*J. Ward Gurley, Jr.*, for Plaintiffs and Appellees.

*Farrar, Jonas* and *Krutschnitt* for Garnishees and Appellants.

The opinion of the Court was delivered by

WATKINS, J. The claim of the plaintiffs against Milliken is for $6200, with 8 per cent interest from the 27th of February, 1883, and based upon a default on a contract for the delivery of 62,000 bushels of corn at New Orleans, on the date named above.

They represent that said corn was actually laden for shipment to them — 35,000 bushels on the barge Brookbank, and 27,000 bushels on the barge Bessemer — on the Ohio river, at or near Paducah, Ky., in January, 1883, and that same was actually shipped to them; but the defendant sent the bills of lading to Kehlor Bros., of St. Louis, to whom he had contracted to ship corn, and that they retained them, and claimed to have purchased the corn on their own account. They represent that they had purchased said corn of defendant for the fulfillment of other contracts, and, in consequence of said failure on the part of defendant to deliver, they were coerced to purchase other corn on an advanced and rising market, and a heavy loss was, thusly, entailed upon them, and which they place at the sum stated above.

As the defendant was a citizen of St. Louis, Missouri, their suit was commenced by an attachment, whereby they sought to reach certain funds, supposed to be in possession of Petit and Lawler, of the City of New Orleans, as the agents of Kehlor Bros., of St. Louis. Consequently, plaintiffs caused Petit and Lawler, as agents, to be cited and made garnishees on the 27th of February, 1883, and, as such, propounded to them certain interrogatories. On the 14th of May, 1883, Kehlor Bros. and J. B. M. Kehlor were cited personally as garnishees, also, and the same interrogatories, substantially, were propounded to

them. On the 21st of May, 1883, Kehlor Bros. and J. B. M. Kehlor in person, made answers to the interrogatories, denying any indebtedness to the defendant, and the possession of any property or money of his. On the 25th of March previous, and on the 26th of May subsequent, Petit and Lawler, as agents of Kehlor Bros., filed like answers. On June 8th, 1883, plaintiffs took a rule on the garnishees to show cause why their answers should not be declared untrue and judgment rendered against them accordingly.

During the pendency of these proceedings the defendant confessed judgment in plaintiffs' favor for the full amount claimed, and final judgment was thereon rendered and signed in this cause.

Upon the traverse of the answers of the garnishees there was quite a protracted trial, and, after hearing a large number of witnesses, and examining quite a multitude of documents and accounts, the learned judge of the lower court rendered a judgment against Kehlor Bros., setting their answers aside, and decreeing them to pay to the plaintiffs the sum of $4442 17, with 5 per cent interest from the 8th of June, 1883, the date plaintiffs' rule was filed.

It is from this judgment that Kehlor Bros., garnishees, prosecute this appeal.

I.

·An objection is pressed, in argument, to the effect that plaintiffs' prayer is that Petit and Lawler, agents of Kehlor Bros., be cited as garnishees, and 'that the judge a quo directed garnishment process to issue against Petit and Lawler, personally, and not as agents, and that citation issued conformably thereto, could not bring Kehlor Bros. into court, and hence the garnishment of February 27th, 1883, must fall.

Conceding this to be the state of the record, no advantage can result to the garnishees, the parties urging the objection, because it, also, appears from the record that, as agents, Petit and Lawler twice answered the interrogatories that were propounded; and they are included in plaintiffs' rule to traverse. It, likewise, appears that the trial of this rule, from start to finish, was proceeded with as though Kehlor Bros. were parties thereto.

Simplified, the objection is to the effect of a citation, and, it being defective and insufficient, the court was without jurisdiction *ratione personæ*. It has been the uniform and consistent jurisprudence of this Court, since Phipps vs. Snodgrass, 31 Ann. 88, that such an objection must be formally taken, *in limine*, and by way of exception, and passed upon by the court before answer is filed.

In the case of Jacobs vs. Frère, 28 Ann. 625, cited and relied upon, is

of the old *regime,* and was, in effect, overruled, quite as well as those cases which are enumerated in the one just quoted and those mentioned in Marquez vs. Le Blanc, 29 Ann. 194, and Scholl Bros. vs. Webre, 30 Ann. 595.

It is too late for such an objection to be made now, particularly by way of argument.

II.

On the merits, the only question presented by this voluminous record of 1300 pages, is, what was the state of accounts between Milliken, the defendant, and Kehlor Bros., garnishees, on the 27th of February, 1883, when the citation was served.

The discussion of this question cannot be better prefaced than by a brief statement or outline of the several contracts of these parties, and of their acts and transactions thereunder.

It appears from the record that the defendant, John T. Milliken made, in the city of St. Louis, several contracts to deliver corn *f. o. b.* in New Orleans, to the agents of Kehlor Bros., garnishees, on account of which contention has arisen in regard to the balance due Milliken in the garnishee's hands.

Those contracts were, substantially, of the following tenor, viz:

*First:* On the 26th of December, 1882, the defendant contracted to deliver to Kehlor Bros., 50,000 bushels of No. 2 white corn, *f. o. b.,* in New Orleans, on the 26th of February, 1883, at 56 cents per bushel, they engaging to advance 51 cents per bushel, on bills of lading and insurance certificates annexed.

*Second:* On the 12th of January, 1883, the defendant contracted to deliver to Kehlor Bros., 50,000 bushels of No. 2 mixed corn, *f. o. b.,* in New Orleans, on the 26th of February, 1883, at 56 cents per bushel, they agreeing to advance 53 cents per bushel—the defendant "retaining the privilege of substituting No. 2 white mixed."

*Third:* On the 15th of January, 1883, the defendant likewise contracted to deliver to Kehlor Bros., 30,000 bushels of No. 2 mixed corn at 56 cents per bushel, *f. o. b.,* in New Orleans, on the 15th of March, 1883, they agreeing to advance 53 cents per bushel upon a St. Louis inspection, or 50 cents on a New Orleans inspection.

*Fourth:* On February 1st, 1883, the defendant likewise contracted to deliver to Kehlor Bros., 50,000 bushels No. 2 white mixed corn, at 58 cents per bushel, *f. o. b.,* in New Orleans, on the 31st of March, 1883, they agreeing to advance 55 cents per bushel.

The total amount of corn deliverable by the defendant under all of

these contracts was 180,000 bushels, and under his contract with Gomila & Co., 62,000.

For the fulfillment of the three contracts matured on the 27th of February, 1883, the defendant had purchased from farmers in Kentucky and Illinois, along the Ohio river, and in the vicinities of Mount Vernon and Paducah, a quantity of corn, in the month of January, 1883, and with it certain barges were laden for shipment to New Orleans; and those barges were combined together into a tow, which the steamer Raven carried to New Orleans, at which place she arrived on the 27th of February, 1883, in ample time to make February deliveries for foreign exportation.

There seems to be no question of the *timeliness* of this delivery, as it clearly appears that delivery was made directly from the Raven's tow into the out-bound steamer Henry Anning, and that the process of delivery was continued until 12 o'clock m., on the night of February 28th, 1883, and that it was at that time, suspended, on account of a want of adequate ship-room.

There were five barges which constituted the Raven's tow, and their names were, respectively, Bessimer, Brookbank, North, Crescent City and H. B. Smith.

It appears that, upon each of these barges, there was a shortage in the quantity of corn, when a comparison is made with their bills of lading.

The following statement substantially exhibits the different amounts that were actually delivered, or the shortage supplied as the equivalent of a delivery under contract, viz :

Per barge Bessemer...................................33,074 21–56
Per barge Brookbank .................................25,479 26–56
Per barge North.......................................21,000
Per barge Crescent City..............................12,674 11–56
Per barge H. B. Smith................................ 5,385 35–56
The aggregate amount being ..........................97,614 31–56

In addition to these deliveries there was, of the cargo of the Crescent City, 5583 12–56, which were alleged to have been damaged in transit; and of the cargo of the H. B. Smith there were 10,924 38–56 bushels, likewise; alleged to have suffered damage in transit.

These two quantities amount to 16,727 38–56.

This damaged, or condemned corn, did not constitute a part of Milliken's delivery, under his contract, because it was rejected by Kehlor Bros.' agents, Petit and Lawler, as not coming up to the requisite grade, —No. 2. Consequently it did not pass through the elevator on ship-

board, but was placed in a bin to itself, was subsequently surveyed and condemned, and passed, irregularly, into the possession of Kehlor Bros., and was, by them, disposed of for their own account. A reason for this will appear in a subsequent part of this opinion.

Thus, it appears that there came into the possession of Kehlor Bros. —including shortages accounted for—114,342 13-56 bushels of corn; that the actual amount shipped was 115,790; and that the shortages, not accounted for, aggregated 14437 33-56.

With regard to these figures and *data* there is, practically, little difference of opinion; but there is quite a serious disparity of opinion as to the proper deduction to be made from them, and the surrounding circumstances, which were detailed, at great length, by different witnesses — and, particularly, with reference to their effect upon Milliken's rights and liabilities, in respect to the garnishees and plaintiffs, and his balance in the former's hands, at date of seizure.

Therefore, it becomes necessary to state these opposing views, as concisely as practicable, because it is upon a correct solution of them that the most difficult problem in this case depends.

The District Judge held—and we state his view because the appellees rest exclusively upon it—in effect, that the 97,614 31-56 bushels of corn, which were discharged from the Raven's tow, were delivered to Kehlor Bros. under the defendant's *first two* contracts, which matured on the 27th of February, 1883, and to be paid for at 56 cents per bushel; that the 16,727 38-56 bushels, which were alleged to have been damaged in transit, were not delivered under *any* contract, but having been *taken possession* of by Kehlor Bros., and sold for their own account, they must be settled upon a different basis; and, that a sufficient amount of the proceeds being *first* applied to the payment of the defendant's shortage of 2387 19-56 bushels, the residue should be credited to Milliken's account as of the date February 27th, 1883.

His theory, as to the method of making this settlement, is that the claim set up by Petit and Lawler with regard to the damage which this lot of corn had sustained, having been made known to defendant, he instructed Kehlor Bros. to sell all that did not come up to grade No. 2, in the New Orleans market, and credit him with the proceeds; and, inasmuch as that class of corn had advanced in the market, he charged Kehlor Bros., in settlement, 68 cents per bushel —holding that the proof did not sanction the charge of damage, and that they were responsible for the current market value in New Orleans, at the date of their appropriation.

His theory is, further to the effect, that plaintiffs' garnishment of

February 27th, 1883, held the entire *proceeds* of the Raven's tow of corn —ascertained as above stated—under the terms and conditions of the defendant's *first* two contracts, and *reached the subsequently ascertained results thereof ;* that defendant's contracts going to maturity on the 15th and 31st of March, thereafter, were not to be taken into account in effecting a settlement between Milliken and Kehlor Bros.; and that, as a necessary consequence, the surplus to Milliken's credit on his matured contracts, could not be held by Kehlor Bros. as a security for any default on *non-*matured contracts—each one of said contracts being independent of the other.

*Per contra* the theory of the garnishees is that the 16,727 38-56 bushels formed a part of defendant's delivery under his three contracts—the two maturing February 27th, and the one maturing March, 31, 1883 — indifferently ; that the entire cargo of the Raven's tow, as well as that on barge No. 21, which had not then arrived, should be taken into consideration in the adjustment of defendant's account with them ; and that, being thus adjusted, there would be nothing remaining to his credit.

It is further to the effect that, on the 27th of February, 1883—the very day on which plaintiffs' first garnishment was served—the defendant made default on his two contracts maturing on the 15th and 31st of March following, for the entire balance due thereon, and the legal consequence thereof was to *mature the balance due them, on all the contracts, as of that date,* and entitled them to hold any surplus there might be in the defendant's favor.

In determining this controversy very much depends upon the precise *status* of these respective contracts, at the time the garnishment was served. It will, therefore, be necessary for us to examine and analyze, in a general way, such portions of the evidence as bear upon it.

But before proceeding therewith, it is well to premise that the principal contention in the lower court seemed to have been whether the alleged default of Milliken was simulated or *bona fide.* The District Judge held it to have been fictitious and simulated. But, in our opinion, there are other *data* which are perfectly conclusive with regard to the *effect* of the default, conceding it, *arguendo,* to have been serious and *bona fide.* In treating of them, we assume as a clear legal proposition, that the four contracts were, in the beginning, distinct and different ; that, upon defendant's fulfillment of either of them, at its maturity, he was entitled to a settlement thereof, and to receive the *net* proceeds, less disbursements, from the consignees ; and that the plaintiffs could take the same by garnishment. Further, that if the defendant's default on *future* contracts did not occur prior to the said *fulfillment* of the

one that had matured, the contractor could not defeat a seizure of a balance in his hands, by a creditor of the contractor.

It is a fact, disclosed by the evidence, that the garnishment was served at five minutes to 3 o'clock on the 27th of February, 1883, in the City of New Orleans, and that the alleged default of Milliken occurred about 5 o'clock on the same day, in St. Louis. It is fully shown by the four telegrams of that date, by Kehlor Bros., addressed to Petit and Lawler, their agents, in New Orleans, that they knew and had advised plaintiffs to garnishee Milliken's balance in their hands, for the purpose of protecting the cargo of corn from plaintiffs' anticipated sequestration. On the same date, Petit and Lawler telegraphed their principals of the service of the garnishment upon them.

Both the principals and the agents being possessed of this information, it was the duty of Kehlor Bros. to have clearly proven that Milliken's default occurred at an earlier hour of the day than the service of garnishment—if such was the fact—because, under the jurisprudence of this court, the hour of the day is attended to in determining the priority of conflicting seizures which confer privileges on the property seized. To *oust* a seizure, altogether, in the manner proposed by the garnishees, and for *their own benefit*, proof equally efficacious should have been administered. 3 Ann. 430, Tufts vs. Carradine.

It was a fact well known to Petit and Lawler, that this service was made at five minutes to 3 o'clock on the 27th of February, and that was the knowledge of their principals; and it was, likewise, well known to both that the Raven's tow was at that time in the port of New Orleans, and the cargo of corn in process of delivery under defendant's contracts maturing on that day.

In furtherance of this theory we have the telegram from Kehlor Bros., of that date, to Petit and Lawler, stating: "Gomila garnishees us for the amounts belonging to Milliken, in our hands. Accept for us, and answer for us that we have *balance due him on corn in New Orleans*, exact amount not ascertained, but estimated to be about $4500."

This telegram was sent to New Orleans *prior* to Petit and Lawler's notification of the service of the garnishment.

Milliken also appears to have been fully advised of the arrival of the Raven's tow in New Orleans, and the delivery of her cargo to Petit and Lawler *prior* to his alleged default, because he says in his written notice to Kehlor Bros.: "That I decline to deliver to you *any more* corn on my several contracts." This language clearly implies that a delivery had been made of *some* corn, and the cargo by the Raven's tow is the only corn, at that date, of which any account is given in the record. It

is, therefore, perfectly manifest that his default had relation to his contracts maturing on the 13th and 31st of March, 1883.

This theory is further confirmed by the letter written by Milliken to Kehlor Bros., under date of March 12th, 1883, prior to the maturity of either of last named contracts, which says:

"By steamer Raven and barges, *I delivered to you in New Orleans, prior to the 27th of February, last,* 111,000 bushels of corn, under my contract with you, accepted prior to that date. I also placed on board barge No. 21, at Cairo, Illinois, 24,000 bushels of corn, which you have not ordered down the river."

This letter was introduced in evidence by the garnishees, and is one of the documents which is relied upon as proving the *bona fides* of Milliken's default.

Comment on this evidence is hardly necessary. To our thinking it points unerringly to one conclusion, and that is the *fulfillment* and *completion* of the two contracts falling due on the 27th of February, 1883, *prior to the defendant's default on other contracts, and prior to the service of the garnishment,* on that date, on Kehlor Bros.; and to there being a balance in their hands to Milliken's credit, of $4500, on that date.

This conclusion seems to be irresistible, when we take into consideration the fact that the garnishees got possession of nearly 12,000 bushels of corn more than they were entitled to receive under those contracts, to the detriment of Gomila & Co.; that they garnisheed that balance at Kehlor Bros.' suggestion; and that this defense is set up by them, as against Gomila & Co., with the undisguised object of consuming that balance, in a settlement with the defendant, and to the injury of Gomila & Co., and against the sworn protest of Milliken.

Counsel for garnishees, in the course of their argument, and in their briefs, frequently referred to the fact that the cargo of the Raven's tow was 12,000 or 15,000 bushels in *excess* of the 100,000 bushels which were deliverable under the defendant's *February* contracts, and to the 24,000 bushels on board the barge No. 21, as proof incontestable of these deliveries being common to, and on account of *all four* of the contracts; and, from this assumption, argue that they had thus become merged and indistinguishable, and, hence, *all* were affected alike by defendant's default.

This argument is wholly untenable.

We have no doubt of it having been the original intention of Milliken to make the shipment of the Raven's tow for the joint account of Kehlor and Gomila; but, becoming embarrassed in his negotiations for, and the purchase of the corn from the farmers, he found himself in such

a situation that he could not carry all of his contracts to their maturity, and he chose to fulfill the larger ones to the garnishees, and to default on the smaller ones to the plaintiffs.

From the proofs above cited it is perfectly clear that the cargo of the barge No. 21 did not arrive for many days subsequent to all of these transactions, and does not, in any way, appertain to their consideration.

On the whole, we think it fairly demonstrated that the *status* of Milliken's account with the garnishees was not affected by his default. While it is true that we have arrived at this conclusion by a slightly different process from the one employed by the judge *a quo*, it is in nowise to the detriment of the latter. We felt constrained to place our opinion on this ground, and thus avoid the unwelcome task of investigating the grave charges of fraud and simulation, in proof of which he cited, in his reasons for judgment, numerous and striking evidences.

### III.

The only remaining duty there is to perform is to adjust the accounts of the defendants and garnishees, and strike a balance, and ascertain what plaintiffs are entitled to receive, if anything.

The following is the statement of the Judge *a quo*, viz:

KEHLOR BROS. DR. TO JOHN T. MILLIKEN.

| | | | | |
|---|---|---|---|---|
| 97,613.37 bushels corn at 56 cents | | | ...........................$54,763 | 95 |
| 16,737.38 " " 68 " | | | ........................ 11,374 | 82 |

$66,138 77

Less 12 cents profit on 2386 19 bushels short on contracts, being difference between 56 and 68 cents...................$    286 32

Gross amount to debt of Kehlor Bros.......................$65,852 45

From which amounts are to be deducted the following credits upon the two contracts in question, and on account of the corn from barges " H. B. Smith" and "Crescent City," to-wit:

| | | | | | |
|---|---|---|---|---|---|
| Feb. 1. | Cash paid | draft against B. L. barge North.......... | $ 9,789 | 85 |
| " 6. | " " | farmers at Mt. Vernon................... | 26,703 | 00 |
| " 19. | " " | draft against B. L. "Crescent City" and "Smith".............................. | 16,755 | 50 |
| " 19. | " " | John T. Milliken....................... | 1,000 | 00 |
| " 28. | " " | Lawrence.............................. | 25 | 00 |
| | " " | transfer on 111,245 16 bushels corn at New Orleans................................ | 556 | 22 |
| | " " | freight bill steamer Raven and barges..... | 6,087 | 98 |
| | " " | Blossom for insurance................... | 249 | 23 |

| | | |
|---|---|---|
| Feb. 28. Cash paid Henry Seeley's expenses................. | 28 | 85 |
| Inspection corn barge Smith...................... | 21 | 78 |
| "      "      "  Crescent City............... | 28 | 94 |
| "      "      "  North...................... | 13 | 38 |
| Interest on $22,500 at 8 per cent. from January 27th to February 28th........................... | 150 | 00 |
| Interest on $119, proportion of insurance for which defendant is liable, paid February 6th, from that date to February 28th........................ | | 55 |

| | | |
|---|---|---|
| Total................................$61,410 | 23 |
| To debt of Kehlor Bros................................$65,852 | 45 |
| By credit............................................ 61,410 | 28 |

Balance due Milliken.....................$ 4,442 17

We will notice a few of the objections that are urged by the garnishees' counsel against this statement of accounts:

1. Complaint is made of the garnishees' debit of $54,763 95 as the proceeds of 97,613 37–56 bushels of corn, on the ground that it, incorrectly includes, as a part of defendant's delivery, the 3076 bushels of corn, which was short in the cargo of the barge North, and which he did not make good until the 21st of March, following.

There is a balance resulting of.............................$52,929 68
From this there is deducted a profit of..................... 286 32

Leaving as true balance the sum of........................$52,643 36

This is incorrect, There is no credit given defendant for the proceeds of the 3096 bushels of corn he paid for, and the defendant is debited, in the judge's statement, with the profit claimed, $286 23. Make these alterations and the original debit is re-established.

2. It is contended that the judge a quo incorrectly allowed Milliken 68 cents for the 16,737 38–6 bushels of corn which were taken possession of by the garnishees, and that it should have been valued at 56 cents. We have already ascertained that this lot of corn was not accepted, or delivered under the defendant's contract, hence the contract price does not control. We think the District Judge correctly fixed its value at the market price, according to the precedents mentioned in his opinion.

3. It is assigned as an error on the lower judge's ruling, that he disallowed a credit of $1438 50, for money alleged to have been paid by garnishees' agent, to one Prestorious, a representative of the defendant, in his negotiations for and purchase of corn in Kentucky and Illinois.

This claim is made on a draft drawn by the defendants on Seeley and in favor of Prestorious for one cent.per bushel on all corn he shall pay for. Seeley claims to have accepted this draft *verbally* and to have paid it subsequently to Prestorious, in installments.

Milliken countermanded payment, and Seeley disregarded the notification, and claims to have paid it on the faith of his verbal acceptance.

There is no pretense that this alleged draft had been negotiated to any one. It remained in the hands of Prestorious until payment was made. Milliken had a clear right to dishonor his draft, and, so long as no third party had acquired any right in it, his command to the drawee was binding and absolute, because it was out of his funds that payment was to be made. If Seeley paid after the receipt of Milliken's notice not to pay, he did so at his peril.

These are the only objections that are seriously urged.

We cannot more appropriately conclude this opinion than by quoting a part of the concluding sentence of the brief of the garnishees' counsel, as follows, viz:

"The opinion of the lower court seems to have been based almost entirely upon the alleged fact that Kehlor Bros., at the end of February, admitted to Gomila's agent, in St. Louis, that they were indebted to John T. Milliken, under the first two contracts, in an amount of $4000. Mr. Kehlor, in his testimony, explains that this alleged admission consisted simply in the making of a pencil calculation showing the amount which Kehlor would owe to John T. Milliken upon the completion of *those two contracts;* but whatever the exact words of the admission may have been, there is no question that Kehlor Bros., would have become indebted to Milliken in an amount approximating $4000, *if Milliken had fulfilled his two first contracts in the manner intended.*"

It has been satisfactorily established that Milliken did so fulfill these contracts, and that the judgment appealed from is correct.

Judgment affirmed.